1  boarding and arrest were then prevented by the Commanding Officer who invoked and

2  explained his own Federal jurisdiction upon the vessel.

3      72.     The INS regularly publishes and distributes a document known as Form I-

4  590.

5      73.     Plaintiffs—physically present on Saipan in the CNMI---have each

6  completed a Form I-590, as exemplified by a sample Form I-590 application appended to

7  this Complaint and designated Exhibit "C".

8      74.     The I-590 forms completed by Plaintiffs have been transmitted to INS

9  offices situated at Saipan, Honolulu, Bangkok and Manila (see, e.g., Exhibits "D" – "F")

10 for processing by INS officials in accordance with INS asylum/refugee/torture protection

11 standards made applicable under U.S. law, but INS's Saipan representative Oscar

12 Martinez ("Martinez")—the INS official then assigned to operate the sole CNMI-situated

13 INS office—refused to accept Plaintiffs' I-590 applications, see, e.g., Exhibits "E" – "G",

14 refused to accept other documents transmitted to his INS office in Saipan, see, e.g.,

15 Exhibit "H", and has returned Plaintiffs' completed I-590 forms to Plaintiffs' attorney's

16 office.

17     75.     The I-590 forms completed by Plaintiffs have been transmitted to INS

18 offices situated in Saipan, Honolulu, Bangkok and Manila for processing by INS officials

19 in accordance with United Nations and/or Federal asylum/refugee/torture protection

20 standards made applicable under treaties and/or international law agreements, and/or

21 customary international law, and/or international protocols (including the 1951

22 Convention and the 1967 Protocol).

23

24

1    76.    Persons seeking protection under the 1985 Torture Convention are

2    required, as a prerequisite, to exhaust asylum/refugee procedures.

3    77.    Plaintiffs have attempted to acquire the protections required to be made

4    available pursuant to the 1985 Torture Convention, including, but not limited to,

5    protection from torture and protection afforded by effect of non refoulement.  See, e.g.,

6    Exhibit "F".

7    78.    On August 10, 1999, Mr. Martinez, the INS official then-assigned to

8    operate the only CNMI-situated INS office, provided notice to Plaintiffs and other

9    similarly situated persons that neither the CNMI-situated INS office manned by Mr.

10   Martinez, nor any other INS office, will or are required to accept for submission and

11   processing any I-590 forms from CNMI-situated applicants.  See, e.g., Exhibits "E" and

12   "G".  This notice was and is false and/or contrary to law and had the intended purpose

13   and effect of misleading the Plaintiffs to believe that they have no refugee/asylum/torture

14   protection rights available to them under U.S. law and/or for the purpose of concealing

15   information from Plaintiffs, suppressing and/or subverting and/or thwarting Plaintiffs'

16   rights, and/or interfering with Plaintiffs' rights.

17   79.    Neither Mr. Martinez, any other U.S. official, nor any CNMI official, since

18   August 10, 1999, has refuted, recanted or overruled Mr. Martinez's August 10, 1999

19   notice.

20   80.    On August 12, 1999, information pertaining to the CNMI Government's

21   policy respecting I-590 applicants, asylum/refugee/torture protection, and the recent

22   involvement of INS officials on the Island of Tinian was sought from both the CNMI

23   Office of the Attorney General ("OAG") via letter to Acting Attorney General Maya

24

1    Kara, and from the CNMI's Department of Labor and Immigration ("DOLI") via letter to

2    DOLI Secretary Mark Zachares, pursuant to 1 CMC Division 9 (the CNMI "Open

3    Government Act"). See, Exhibit "I".

4        81.    Neither Mr. Zachares nor any other DOLI official has ever responded to

5    the August 12, 1999 Open Government Act request.

6        82.    On March 1, 2002, a follow-up request was transmitted in writing to

7    present CNMI Attorney General/Defendant Torres, and to his subordinate CNMI

8    Assistant Attorney General Andrew Clayton ("Clayton"). A copy of that letter, appended

9    as the first of sixteen exhibits appended to Plaintiffs' pleading, was filed with the Court

10    on March 21, 2002.

11        83.    To date, no documents, no materials, and no requested information, have

12    been provided by Ms. Kara, Mr. Zachares, Defendant Torres, Mr. Clayton, Defendant

13    Tenorio, any past CNMI Acting or Confirmed CNMI Attorney General, any OAG or

14    DOLI personnel, or any other CNMI representative or entity, in response to the August

15    20, 1999 Open Government Act request, or to the March 1, 2002 follow-up Open

16    Government Act request.

17        84.    Defendant CNMI, together with Defendant Torres and Defendant Tenorio,

18    and through others employed by the CNMI and/or supervised by Defendant Torres and

19    Defendant Tenorio, are responsible for the administration, supervision and enforcement

20    of laws applicable to and within the CNMI.

21        85.    Defendant U.S., together with Defendant Ashcroft and Defendant Powell,

22    and through others employed by the U.S. and/or supervised by Defendant Ashcroft and

23

24

1   Defendant Powell, are responsible for the administration, supervision and enforcement of

2   Federal laws applicable to the CNMI for the benefit of persons within the CNMI.

3       86.     Defendant CNMI hired and/or appointed Defendant Torres, Defendant

4   Tenorio, Goldberg, Zachares, Clayton, and other lawyers and/or persons, with Defendant

5   Torres and Defendant Tenorio now tasked with primary responsibility for the

6   administration, supervision and enforcement of CNMI asylum/refugee/torture protection

7   obligations, policies, and procedures, and with CNMI immigration laws.

8       87.     Defendant Ashcroft and Defendant Powell create, administer, supervise

9   and enforce—or neglect and/or fail to create, administer, supervise, and enforce—U.S.

10  policies and procedures and make or neglect/fail to make policy decisions, including, but

11  not limited to, policies and procedures relating to asylum/refugee/torture protection

12  within the U.S. and applicable within the CNMI.

13      88.     Defendant Torres and Defendant Tenorio create, administer, supervise and

14  enforce—or neglect and/or fail to create, administer, supervise, and enforce---CNMI

15  policies and procedures and make or neglect/fail to make policy decisions, including, but

16  not limited to, policies and procedures relating to asylum/refugee/torture protection

17  within the CNMI.  Goldberg, Zachares, and others, when formerly employed by the

18  CNMI and while at DOLI, performed and/or failed to perform similar functions.

19      89.     Defendant Ashcroft and Defendant Powell provide instruction and

20  direction and instruct and direct U.S.-employed personnel (and/or fail to do so),

21  including, but not limited to persons working at the U.S. Department of Justice (including

22  the Office of the U.S. Attorney and the INS) and the U.S. Department of State.

23

24

1      90.    Defendant Torres and Defendant Tenorio provide instruction and direction

2  and instruct and direct CNMI-employed personnel (and/or fail to do so), including, but

3  not limited to persons working at the Office of the CNMI Attorney General ("OAG"), and

4  at DOLI including DOLI's prison facility.  Goldberg, Zachares, and others, when

5  formerly employed by the CNMI, performed and/or failed to perform similar duties.

6      91.    Upon information and belief Goldberg's salary was paid by DOLI.

7      92.    Upon information and belief, Goldberg's salary, although paid by DOLI,

8  was funded in whole or in part by the Federal government.

9      93.    Plaintiff AHMED was imprisoned at DOLI's prison facility between July

10  1998 and March 2000.  Plaintiffs Liang and Nian were similarly imprisoned in DOLI's

11  prison facility during Fall/Winter 2000.

12      94.    Defendant CNMI, Defendant U.S., and Doe Defendants, in tandem with

13  Goldberg, Zachares, and others,  devised, planned and implemented policies and

14  procedures relating to the imprisonment of various DOLI prisoners, including Plaintiffs

15  AHMED, LIANG AND NIAN.

16      95.    Defendant CNMI, Defendant U.S., and Doe Defendants, in tandem with

17  Goldberg, Zachares, and others, devised, planned and implemented policies and

18  procedures relating specifically and exclusively to the imprisonment of Plaintiffs

19  AHMED, LIANG AND NIAN.

20      96.    In devising, planning and implementing policies and procedures relating to

21  the imprisonment of Plaintiffs Ahmed, Liang and Nian, Defendant Goldberg authorized,

22  condoned and acquiesced in ignoring and disregarding the liberty interest of Plaintiffs

23  Ahmed, Liang and Nian.

24

1    97.    In devising, planning and implementing policies and procedures relating to

2  the imprisonment of Plaintiffs Ahmed, Liang and Nian,  Defendant CNMI, Defendant

3  U.S., and Doe Defendants, in tandem with Goldberg, Zachares, and others, authorized,

4  ratified, condoned and acquiesced in those Defendants' adopting a custom and pattern of

5  practice of ignoring and disregarding the liberty interests of Plaintiffs AHMED, LIANG

6  AND NIAN, in violation of and disregard of the liberty interests guaranteed to AHMED,

7  LIANG AND NIAN by effect of CNMI law, Federal law, the CNMI Constitution and the

8  U.S. Constitution.

9    98.    Plaintiffs possess liberty interests and property rights to be free from

10  arbitrary and indefinite and capricious detention, which interest/rights arise by effect of

11  CNMI law, Federal law, the CNMI Constitution and the U.S. Constitution. See, e.g., 3

12  CMC secs. 4341(d), 4382(b), 4382(c).

13    99.    Zachares was appointed DOLI's Acting Secretary by effect of a CNMI

14  memorandum dated February 11, 1998, during the then-CNMI-administration headed by

15  former CNMI Governor Pedro P. Tenorio.  This designation was reiterated in a second

16  CNMI memorandum dated May 4, 1998.  Three weeks later, on May 28, 1998, Zachares'

17  appointment was confirmed, removing his "Acting Secretary" title, in lieu of the

18  permanent "Secretary" position he then held through January 2002.

19    100.    On December 27, 2001, the Court ordered Defendant CNMI to provide

20  materials to the court.  Only then—by way of a submission filed January 4, 2002, see,

21  Exhibit "G-1", which submission Defendant CNMI did not voluntarily provide to

22  Plaintiffs, id. at p.2, lines 16-21—did the CNMI and Zachares disclose, in Zachares'

23  January 4, 2002 declaration, see Exhibit "H-1", the existence of a letter received 3 years

24

1   and 7 months earlier from then-INS Commissioner Doris Meissner to then-CNMI

2   Governor Tenorio dated May 15, 1998. See, Exhibit "I-1".

3       101.   The May 15, 1998 letter ("letter"), similarly, had never been disclosed by

4   Defendant U.S., the multitude of U.S.-employed attorneys in this proceeding, or anyone

5   connected to this proceeding since its inception 2 years and 8 months ago.

6       102.   The letter, in pertinent part, documents the CNMI's failure to recognize

7   and/or abide by CNMI and U.S. asylum/refugee/torture protection requirements, while

8   memorializing the CNMI's deportation of two Sri Lankan nationals at that time to their

9   home country despite their prior efforts---known to CNMI officials---to be afforded their

10   asylum/refugee/torture protection rights. Id. In part, the letter stated: "It is essential that

11   the CNMI stay the deportation of any individual identified by...the United States

12   Government as a potential refugee until appropriate resolution of that individual's claim

13   to refugee status." Id. at p.1, ¶3.

14       103.   Defendant CNMI, by and through Defendant Torres and Defendant

15   Tenorio, and in apparent tandem with and/or acquiescence and/or ratification by,

16   Defendant U.S. and/or Defendant Ashcroft and/or Defendant Powell and/or Doe

17   Defendants and/or their respective employees and agents, nevertheless continue—as

18   recently as two months ago, to deport CNMI-situated persons to their countries of origin,

19   despite the fact known to CNMI officials that such persons have submitted requests for

20   asylum/refugee/torture protections, which submissions are pending as the applicants are

21   nonetheless deported by the CNMI.

22       104.   The facts alleged in the previous example have been memorialized by

23   documents, including CNMI Superior Court pleadings, relating to PRC citizen Zhen Wen

24

1    Zhu, who was taken into custody on a recent Friday afternoon by CNMI officials, while

2    there telephoned CNMI resident Juan Santos ("Santos"), notified Mr. Santos that DOLI

3    would deport him the following Sunday, and was then whisked from the CNMI by

4    airplane as explained May 10, 2002 by Mr. Santos.  These documents include copies of:

5    (i) the I-590 application signed by Mr. Zhu and submitted on his behalf by CNMI-situated

6    attorney Joseph A. Arriola, Exhibit "J-1"; (ii) A cover letter drafted and signed by Mr.

7    Arriola which, together with the enclosed I-590 form, was then transmitted to various

8    U.S. and CNMI agencies, Exhibit "K-1"by certified mail and otherwise, Exhibit "L-1";

9    (iii) the written order by which CNMI Superior Court Judge David A. Wiseman, on

10   January 24, 2002, memorialized having received notice of the I-590 submission, Exhibit

11   "L-1" at p.1, lines 21-27; (iv) a CNMI-published newspaper article, published 12 days

12   later on February 5, 2002, in which Defendant Torres acknowledges the applicability of

13   asylum/refugee/torture protections to and within the CNMI, Exhibit "M-1"; (v) the notice

14   signed February 4, 2001 by Judge Wiseman, memorializing again both Judge Wiseman's

15   and the OAG's receipt of a copy and notice of Mr. Zhu pending asylum/refugee/torture

16   protection request, Exhibit "0-1", at p.2, ¶1 (Exhibit "N-1" omitted intentionally); and,

17   (vi) Judge Wiseman's subsequent order documenting that Mr. Wen was in fact ordered

18   deported by the CNMI Superior Court on February 14, 2002, Exhibit "P-1", before being

19   taken into CNMI custody, imprisoned at the DOLI jail, and physically removed from the

20   CNMI as reported by Mr. Santos.

21        105.    On April 18, 2002 in this proceeding, as documented by the transcript

22   excerpt appended as Exhibit "Q-1", the Court agreed with CNMI attorney Clayton "that

23   the Commonwealth has been embarrassed by this case", pointed out that "[t]he United

24

-23-

1   States or the Commonwealth has a duty to either promulgate some rules that are

2   consistent with the international treaties that the United States is a signatory of", and

3   remarked that "both of them can't sit on the side lines pointing the fingers at each other."

4   Id.

5                              **FIRST CLAIM FOR RELIEF**

6          106.    Plaintiffs by this reference reallege and incorporate the allegations set forth

7   in the preceding paragraphs.

8          107.    Plaintiffs state this claim for declaratory and injunctive relief against

9   defendants Powell, Ashcroft, Tenorio and Torres, and\or other officials of the United

10   States of America who are presently unknown to plaintiffs, and\or other officials of the

11   Commonwealth of the Northern Mariana Islands who are presently unknown to plaintiffs,

12   in their official capacities, to enforce their rights to a determination of their status as

13   refugees and to be free from refoulement and deportation pending such determination

14   pursuant to federal law, including 42 U.S.C. sec. 1983.

15          108.    Plaintiffs have a well founded fear of being subject to personal and

16   political persecution, torture, inhumane treatment, punishment, loss of liberty, physical

17   and emotional pain and suffering, involuntary separation from their children, spouses and

18   other family members, and\or other severe harms cognizable under international law if

19   they are refouled or deported.  Plaintiffs can demonstrate that they would be threatened

20   and\or that there is a clear probability they would suffer these grievous injuries if they

21   were refouled or deported.

22          109.    Plaintiffs have a substantive right to seek refugee status pursuant to § 207

23   of the INA, and\or pursuant to international law.

24

1   110.   Plaintiffs have a substantive right to be free from refoulement pending a

2   determination of their refugee status pursuant to § 207 of the INA and\or pursuant to

3   international law.

4   111.   The Commonwealth of the Northern Mariana Islands has duties to

5   determine plaintiff's eligibility for refugee status and protect plaintiffs from refoulement

6   or deportation pending such determination arising under international law.

7   112.   The United States of America has duties to determine plaintiff's eligibility

8   for refugee status pursuant to § 207 of the INA and to protect plaintiffs from refoulement

9   or deportation pending such determination arising under international law.

10   113.   Defendants Powell, Ashcroft, Tenorio and Torres and\or other officials of

11   the United States of America and\or the Commonwealth of the Northern Mariana Islands

12   have duties, jointly and severally, to determine whether plaintiffs are eligible for refugee

13   status and to protect plaintiffs from refoulement and deportation pending any

14   determination of their eligibility for refugee status.

15   114.   In the alternative, defendants Tenorio and Torres, and\or other officials of

16   the Commonwealth of the Northern Mariana Islands are under duty arising under

17   international law to determine whether plaintiffs are eligible for refugee status and to

18   protect plaintiffs from refoulement and deportation pending any determination of their

19   eligibility for refugee status.

20   115.   Defendants Powell, Ashcroft, Tenorio and Torres, and\or other officials of

21   the United States and\or the Commonwealth of the Northern Mariana Islands have and

22   continue to deny plaintiffs of their right to a determination of their refugee status

23   arbitrarily and without due process.

24

-25-

1    116.    Defendants Tenorio and Torres continue to threaten plaintiffs with

2  immediate refoulement or deportation without having first ensured that plaintiff's

3  eligibility for refugee status has been finally determined.

4    117.    Plaintiffs will suffer irreparable harm, political and personal persecution,

5  pain, torture, imprisonment, denial of their civil rights, and denial of their human rights if

6  they are refouled or deported.

7    118.    In the alternative, plaintiffs reasonably fear that they will suffer political

8  and personal persecution, pain, torture, imprisonment, denial of their civil rights and

9  denial of their human rights if they are refouled or deported.

10    119.    Plaintiffs now suffer fear, trepidation, humiliation, and severe emotional

11  distress directly and proximately caused by defendants' continuing arbitrary and

12  capricious failure and refusal to determine their eligibility for refugee status.

13    120.    Plaintiffs claim right to a declaration by this court of their rights under §

14  207 of the INA to a determination of their eligibility for refugee status by defendants

15  Powell, Ashcroft, and\or other officials of the United States of America.

16    121.    Plaintiffs claim right pursuant to 28 U.S.C. § 2201 and\or this court's

17  inherent powers to a declaration of their rights under international law to a determination

18  by defendants Tenorio, Torres, and\or other officials of the Commonwealth of the

19  Northern Mariana Islands of their eligibility for refugee status.

20    122.    Plaintiffs claim right pursuant to 28 U.S.C. § 1361, § 1651, § 2202, and\or

21  this court's inherent powers to preliminary and permanent injunctions enjoining

22  defendants Powell, Ashcroft, Tenorio, Torres, and other officials of the United States of

23  America or the Commonwealth of the Northern Mariana Islands from arbitrarily and

24

1    capriciously continuing to deny plaintiffs of their right to a determination of their refugee

2    status without due process of law.

3       123.    Plaintiffs claim right pursuant to 28 U.S.C. § 1651, § 2202, and\or this

4    court's inherent powers to preliminary and permanent injunctions enjoining defendants

5    Tenorio and Torres from refouling or deporting plaintiffs at any time before their

6    eligibility for refugee status is finally determined under due process of law.

7       124.    Plaintiffs claim right to costs for bringing this action.

8       125.    Plaintiffs claim right to attorney fees for bringing this action pursuant to

9    42 U.S.C. § 1988 and\or the Equal Access to Justice Act, (Pub. L. 96-481, Title II, Oct.

10    21, 1980, 94 Stat. 2325).

11

12                  **SECOND CLAIM FOR RELIEF**

13       126.    Plaintiffs by this reference reallege and incorporate the allegations set forth

14    in the preceding paragraphs.

15       127.    Plaintiffs state this claim to enforce their rights to be free from torture and

16    other forms of cruel and inhuman treatment or punishment and to be free from

17    refoulement or deportation to a country where they might be subject to such treatment.

18       128.    Plaintiffs states this claim for relief against the Commonwealth officials

19    named herein in their official capacities pursuant to federal law including 42 U.S.C. §

20    1983, the United Nations Convention Against Torture and Other Forms of Cruel and

21    Inhuman or Degrading Treatment or Punishment (Convention Against Torture), and

22    international law.

23

24

1    129.    Plaintiffs states this claim for relief against the United States officials

2  named herein pursuant to the Foreign Affairs Reform and Restructuring Act (FARR),

3  Pub. L. No. 105-277, 1999 U.S.C.C.A.N. 871, the Convention Against Torture, and

4  international law.

5    130.    The Convention Against Torture is jus cogens and binding on the

6  Commonwealth of the Northern Mariana Islands.

7    131.    Plaintiffs have substantive rights to be free from torture, cruel and

8  inhuman treatment, and degrading treatment or punishment arising under the FARR, the

9  Convention Against Torture, and under international law.

10    132.    Both the United States of American and the Commonwealth of the

11  Northern Mariana Islands are under mandatory duties to ensure that plaintiffs are not

12  subject to torture, inhuman or degrading treatment or inhuman or degrading punishment

13  or refouled or deported to a country where they might be subject to such treatment.

14    133.    Section 2242(b) of the Foreign Affairs Reform and Restructuring Act

15  (FARR) required that the "heads of the appropriate agencies" prescribe regulations within

16  120 days to implement the United States' obligations under Article 3 of Convention

17  Against Torture.

18    134.    Defendants Tenorio and Torres are heads of appropriate agencies within

19  the meaning of the FARR. Defendants Powell and Ashcroft have failed to prescribe

20  regulations applicable in the Commonwealth of the Northern Mariana Islands, and have

21  failed to consult with or take any acts to require defendants Tenorio or Torres to prescribe

22  such regulations to implement the United States of America's obligations under Article 3

23  of the Convention Against Torture.

24

-28-

1    135.    Defendants Powell, Ashcroft, Tenorio, and\or Torres have and continue to

2    arbitrarily and capriciously fail and refuse to take any acts to ensure plaintiffs are not

3    subject to torture, inhuman, degrading treatment or punishment, or ensure plaintiffs are

4    not refouled or deported to a country where they might be subject to such treatment.

5    136.    Plaintiffs claim right pursuant to 28 U.S.C. § 2201 and\or this court's

6    inherent powers to a declaration of their rights to be free from torture, cruel and inhuman

7    treatment, degrading treatment, or degrading punishment arising under the Convention

8    Against Torture, the FARR, and under international law.

9    137.    Plaintiffs claim right pursuant to 28 U.S.C. § 1361, § 1651, § 2202, and\or

10    this court's inherent powers to preliminary and permanent injunctions enjoining

11    defendants Powell, Ashcroft, Tenorio, and\or Torres from subjecting plaintiffs to torture,

12    cruel and inhuman treatment, and degrading treatment or punishment and enjoining them

13    from refouling or deporting plaintiffs to a country where they might be subject to such

14    treatment without due process of law.

15    138.    Plaintiffs claim right to a preliminary and permanent injunction mandating

16    that defendants Powell, Ashcroft, Tenorio and\or Torres immediately prescribe

17    regulations to ensure plaintiffs rights are protected under due process of law

18    139.    Plaintiffs claim right to costs for bringing this claim.

19    140.    Plaintiffs claim right to attorney fees for bringing this claim pursuant to 42

20    U.S.C. § 1988 and\or pursuant to the Equal Access to Justice Act, (Pub.L. 96-481, Title

21    II, Oct. 21, 1980, 94 Stat. 2325).

22    \\

23    \\

24

1

### THIRD CLAIM FOR RELIEF

2    141.   Plaintiffs by this reference reallege and incorporate the allegations set forth

3  in the preceding paragraphs.

4    142.   Plaintiffs state this claim for relief to enforce their rights under the Alien

5  Tort Claims Act and international law as against the Commonwealth of the Northern

6  Mariana Islands.

7    143.   The Commonwealth of the Northern Mariana Islands, acting by and

8  through Robert Goldberg, Assistant Attorney General for the Commonwealth of the

9  Northern Mariana Islands, Mark Zachares, Secretary of the Commonwealth Department

10  of Labor and Immigration, DOES 7-25, their supervisors, and others who are unknown to

11  plaintiff, instituted an official government policy of "zero tolerance" toward aliens

12  present in the Commonwealth.

13    144.   Part of the Commonwealth's zero tolerance policy included policies and

14  practices of arbitrarily detaining aliens for prolonged periods of time.

15    145.   Part of the Commonwealth's zero tolerance policy included denying that

16  aliens have any rights to seek refugee status, to be protected from refoulement or

17  deportation while a determination was made as to refugee status, to be free from arbitrary

18  and prolonged detention, or to be free from .

19    146.   Part of the Commonwealth's zero tolerance policy included purposely

20  failing to disclose and affirmatively concealing all information and communications

21  establishing the rights of aliens to apply for refugee status and be protected from

22  refoulement or deportation pending a determination of refugee status.

23

24

1    147.    Part of the Commonwealth's zero tolerance policy included interfering

2  with, and misrepresenting these rights to all aliens in the Commonwealth, including

3  plaintiffs.

4    148.    Part of the Commonwealth's zero tolerance policy included preventing

5  plaintiffs from communicating with the outside world, or hiring or communicating with

6  an attorney with the purpose of denying plaintiffs of all assistance or relief from arbitrary

7  and prolonged detention.

8    149.    The Commonwealth's zero tolerance policy directly and proximately

9  caused plaintiffs Ahmed, Liang, and Nian to suffer prolonged arbitrary detention, physical

10  and emotional pain and suffering, fear, trepidation, severe emotional distress, loss of

11  liberty and freedom, loss of their right to work, and denial of their rights to equal

12  protection and due process.

13    150.    Plaintiffs claim right to compensatory and punitive damages against the

14  Commonwealth of the Northern Mariana Islands, and DOES 7-25, in their individual

15  capacities, pursuant to the Alien Tort Claims Act and RESTATEMENT (THIRD) OF THE

16  FOREIGN RELATIONS LAW OF THE UNITED STATES § 702.

17

18                    **FOURTH CLAIM FOR RELIEF**

19    151.    Plaintiffs by this reference reallege and incorporate the allegations set forth

20  in the preceding paragraphs.

21    152.    Plaintiffs states this claim for relief to enforce their right to be free from a

22  conspiracy to deny them of their civil and constitutional rights pursuant to 42 U.S.C. §

23  1985.

24

153.    Plaintiffs have rights to apply for refugee status, to be free from refoulement and deportation, and to be free from arbitrary and prolonged detention, to be free from torture, and other forms of cruel and inhuman treatment or punishment under international law, to equal protection, and to due process. Defendants have arbitrarily and capriciously deprived plaintiff of these rights in violation of plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

154.    Defendants Tenorio, Torres, DOES 7-25, their supervisors and subordinates have and continue to collectively conspire and directly and proximately cause plaintiffs to suffer a deprivation of these rights on the basis of plaintiffs race, nationality, ethnicity, and\or alienage.

155.    Defendants have and continue to conspire together to withhold and conceal information, to misrepresent facts, to mislead with the purpose denying rights and inducing reliance, and to actually prevent plaintiffs as well as all other aliens in the Commonwealth from learning about or exercising their rights to apply for refugee status, to be free from refoulement or deportation, to be free from arbitrary and prolonged detention, to be free from torture and other forms of cruel and inhuman treatment or punishment, to equal protection, and to due process.

156.    As a direct and proximate cause and result of the conspiracy among defendants and their acts taken in furtherance of that conspiracy, plaintiffs have suffered harm and injuries including denial of their constitutional, civil and other rights under international law, physical and emotional pain and suffering, fear, trepidation, and severe emotional distress.

1       157.    Plaintiffs claim right pursuant to 42 U.S.C. § 1985 to compensatory and

2  punitive damages in an amount to be shown at trail against defendants Tenorio, Torres,

3  DOES 7-25, together with their supervisors and subordinates for conspiracy.

4       158.    Plaintiff claims right to costs for bringing this action.

5       159.    Plaintiff claims right to attorney fees for bringing this action pursuant to

6  42 U.S.C. § 1988.

7

8                           **FIFTH CLAIM FOR RELIEF**

9       160.    Plaintiffs by this reference reallege and incorporate the allegations set forth

10  in the preceding paragraphs.

11       161.   Plaintiffs state this claim to enforce their rights to be free from physical

12  harm caused by the concealment of information by government officials pursuant to

13  RESTATEMENT (SECOND) TORTS § 557A.

14       162.    Plaintiffs state this claim for relief under the common law of the

15  Commonwealth for concealment against defendants Tenorio, Torres, DOES 1-25, and

16  their supervisors and subordinates.

17       163.    For more than two (2) years, Defendants U.S., the CNMI, DOES 7-25, and

18  Mark Zachares and Robert Goldberg intentionally and/or negligently concealed

19  Defendants' knowledge or information concerning the acceptance and processing of

20  asylum/refugee and torture protection applications by plaintiffs PRC, Sri Lanka and

21  Bangladesh citizens within the CNMI, including but not limited to the claims now being

22  asserted by Plaintiffs, and the unconstitutional and unlawful deprivations of their right to

23  due process and equal protection under the United States Constitution and CNMI which

24

1    Plaintiffs and were thereby subjected by the Defendants. (See Exhibit G1 letter from

2    Doris Meissner  U.S. Department of Justice to then Governor Pedro P. Tenorio, a copy of

3    which is attached hereto, and incorporated herein)

4        164.    Plaintiffs have also attempted to acquire the protections required to be

5    made available pursuant to the 1985 Torture Convention, including, but not limited to,

6    protection from torture and protection afforded by effect of non refoulement.  See, e.g.,

7    Exhibit "F".

8        165.    On August 10, 1999, Mr. Oscar Martinez, the INS official assigned to

9    operated the only CNMI-situated INS office, provided notice to Plaintiffs and other

10   similarly situated persons that neither the CNMI-situated INS office manned by Mr.

11   Martinez nor any other INS office will accept for submission and processing any I-590

12   forms in direct contradiction to United States law and procedure.  See Exhibits "E" and

13   "G" and Meissner letter.

14       166.    This statement implied, and Plaintiffs were fraudulently led to believe, and

15   did believe, that the INS office in the CNMI was not empowered to accept asylum

16   applications from CNMI-situated aliens.

17       167.    This statement was and is false intentionally misleading and contrary to

18   law, and  had the intended purpose and effect of misleading and misinforming the

19   Plaintiffs to believe that they had no refugee/asylum rights available to them under U.S.

20   law.

21       168.    Mr. Martinez, an employee of the United States  knew or should have

22   known that refuge/asylum petitions pursuant to INA sec. 207 were and are available to

23   alien persons situated outside the United States.

24

-34-

169.   Mr. Martinez knew or should have known that refuge/asylum petitions pursuant to INA sec. 207 were available to alien persons situated in the CNMI.

170.   Neither Mr. Martinez, any other U.S. official, nor any CNMI official has, since August 10, 1999, refuted, recanted or overruled Mr. Martinez's August 10, 1999, notice, which constituted concealing knowledge or information that he was under an affirmative duty not to conceal.

171.   On August 12, 1999, information pertaining to the CNMI Government's policy respecting I-590 applicants and the recent involvement of INS officials on the Island of Tinian was sought from both the CNMI Office of the Attorney General ("OAG") via letter to Acting Attorney General Maya Kara, and from the CNMI's Department of Labor and Immigration ("DOLI") via letter to DOLI Secretary Mark Zachares, pursuant to 1 CMC Division 9 (the CNMI "Open Government Act").  See Exhibits "I" and "J".

172.   Since Plaintiffs were unaware of the concealed knowledge or information, and had relied upon Defendants to comply with Defendants' obligations to provide that knowledge or information to Plaintiffs and others, Plaintiffs were misled by Defendants.

173.   Defendants' concealment of relevant knowledge and information from the Plaintiffs was intentional and/or negligent.

174.   Defendants had a duty to disclose true and relevant information to them and an affirmative duty not to mislead Plaintiffs to their detriment.

175.   Defendants' concealment of relevant knowledge and information from the Plaintiffs was and is in violation of Restatement (Second) of Torts sec. 557A.

1    176.    Defendants' conduct subjects the plaintiffs and defendants to the

2    jurisdiction of this court pursuant the Alien Tort Claims Act, 28 U.S.C. sec. 1350, in that

3    the conduct committed by the Defendants will subject the  plaintiffs to torture or

4    imminent fear of torture as describes in U.S. Public Law 102-256 the Torture Victim

5    Protection Act of 1991.

6    177.    Defendants' concealment of relevant knowledge and information from the

7    Plaintiffs has caused Plaintiffs to suffer, and to continue suffering, injuries and damages.

8    178.    Defendants are liable to the Plaintiffs as a consequence of the above-

9    described concealment for all of the previously-described damages and injuries and for

10    further consequential damages directly or indirectly resulting therefrom.

11    179.    In order to deter Defendants and others similarly situated from further

12    engaging in the previously described wrongful, wanton and willful conduct, Plaintiffs

13    further request that punitive damages be imposed against Defendants in an amount to be

14    determined at trial.

15    180.    Plaintiffs claim right to compensatory and punitive damages in an amount

16    to be shown at trial against the defendants named above.

17

18    **PRAYER FOR RELIEF**

19    WHEREFORE, plaintiffs respectfully request judgment granting them the

20    following relief:

21        1.    Monetary damages in an amount to be proven at trial;

22        2.    Injunctive relief, in a manner to be more particularly described

23    prior to or at trial, pursuant to all applicable legal and equitable considerations;

24

-36-

1        3.    Declaratory relief, in a manner to be more particularly described

2    prior to or at trial, pursuant to all applicable legal and equitable considerations;

3        4.    All legal and equitable remedies deemed appropriate under the

4    circumstances, including but not limited to any equitable remedies to be fashioned by the

5    court;

6        5.    All attorney's fees, costs, prejudgment interest, and postjudgment

7    interest, legally and equitably permissible, in an amount to be determined at

8    trial—together with a lodestar multiplier;

9        6.    All further legal and equitable relief deemed appropriate, or

10   fashioned by the court, under the circumstances.

11       Dated:  May 10, 2002.

12

13

14   Bruce L. Jorgensen
     Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24



Decl   ation/Verification of Ju   ɭ Ahmed

I, Juyel Ahmed, declare and verify, under penalty of perjury of the Commonwealth of the Northern Mariana Islands ("CNMI"), that:

1.   I am a Bangladesh citizen presently being imprisoned, by the CNMI Government, at the prison facility operated by the CNMI's Department of Labor and Immigration ("DOLI").

2.   I have been imprisoned by the CNMI, for an indefinite period, since July 1, 1998 (more than 20 months).

3.   My initial entry to the CNMI, as a tourist, was lawful. Subsequently, however, I was arrested by CNMI authorities for failing to depart the CNMI.

4.   Before my lawful entry to the CNMI, I was the victim of torture, by Bangladesh Government authorities. That torture arose during the course of my arrest, imprisonment, and interrogation by Bangladesh police, during which police attempted to coerce a "confession" from me in various ways, including:

a.   beating my body with wood/metal batons (breaking my left hip in the process);

b.   inflicting lacerations on my body and, immediately afterwards, pouring salt into the bleeding lacerations;

c.   slicing the bottoms of my feet, with a straight razor;

d.   forcing my nose and mouth into boiling water.

5.   During the first year of my CNMI imprisonment, I was routinely permitted to communicate with persons who visited me at the prison, and via the prison telephone with persons outside the prison.

6.   Later, during July 1999, there began appearing in CNMI newspapers a variety of articles relating to prospective Federal/CNMI asylum/refugee proceedings, including those described in the appended documents labeled **Exhibits "1"-"2"**. In response, the CNMI's Secretary of Labor and Immigration issued what, in apparent effect, constituted a temporary "discontinuance" of new CNMI entry permits to Peoples' Republic of China citizens. See, **Exhibit "3"**.

7.   Nearly simultaneously with the appearance of those articles, the CNMI Government, upon information and belief at the express instruction of CNMI Assistant Attorney General Robert Goldberg:

a.   terminated my right, and prevented my efforts, to communicate with persons who wished to visit me at the prison



EXHIBIT **"A"**

(including my brot.  :) ; and,

b.    terminated my right, and prevented my efforts, to communicate via the prison telephone with all persons outside the prison.

8.    During the following months, and until several weeks ago, the CNMI Government, upon information and belief at the express instruction of Mr. Goldberg, continued to preclude me from communicating with prison visitors.

9.    During the months described in the preceding paragraph, and continuing through the present, the CNMI Government, upon information and belief at the express instruction of Mr. Goldberg, has continued to preclude me from communicating with prison via the prison telephone (although, recently, I was able to gain temporary access to, and use of, that telephone).

10.    During the months described in the preceding paragraph, and continuing through the present, the CNMI Government, upon information and belief at the express instruction of Mr. Goldberg, and on those occasions when Mr. Goldberg was physically present at the DOLI prison, forbade prisoners from having access to or making use of newspapers, cigarettes, and other ordinary items.

11.    During the months described in the preceding paragraph, and continuing through approximately January 22, 2000, a fellow Bangladesh prisoner named Rofiqul Islam, and I, attempted to communicate with attorney Bruce L. Jorgensen in order to request that he represent us with respect to the indefinite imprisonment, related constitutional and legal deprivations, and other wrongful conduct, to which we were being subjected..  Our efforts to communicate with prospective counsel were futile because we were not permitted to have contact with prison visitors or to use the prison telephone.

12.    On or about January 22, 2000, Mr. Islam, having been precluded from communicating with Mr. Jorgensen or other prospective counsel, was deported by the CNMI. This was, upon information and belief, two weekend days before Mr. Jorgensen caused to be filed (on Monday, January 24, 2000) the Liang, et.al. v. CNMI, et.al. CNMI Superior Court Special Proceeding No. 00-0050E habeas corpus matter, which had been contemplated by Mr. Goldberg and others the previous week, as it was the subject of discussion that week before Judge Munson and others (including Mr. Goldberg), in the Liang, et.al. v. U.S., et.al. Federal Court Civil Action No. 99-0046 matter.

13.    On February 23, 2000, through a series of intermediaries, I was finally able to contact Mr. Jorgensen.  It was then that I finally able to learn about:

a.    the CNMI's purported obligations to me and persons similarly situated, by effect of CNMI statutory law, Federal

statutory law, Fed al/CNMI treaty obligat , and Federal/CNMI stitutional law, includ ;

    1) those codified as CNMI statutory law, by effect of 7 CMC §3401, such as:

    a) the <u>Restatement (Third) of Foreign Relations Law</u>, including:

    i) §102(1)(a),(2) (<u>Sources of International Law/Customary International Law</u>);

    ii) §111(1)(International Law and Agreements as Law of the United States (including both the <u>Convention Relating to the Status of Refugees</u> ("1951 Convention") and the <u>United Nations Protocol Relating to the Status of Refugees</u> ("1967 Protocol")

    iii) §701(b)(<u>Obligation to Respect Human Rights</u>);

    iv) §702(d)(e)(<u>Customary International Law of Human Rights</u>); and,

    b) the <u>United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment</u>, G.A.O.R. A/39/506 (1984), 23 I.L.M. 1027 (1984)(modified in 24 I.L.M. 535 (1985)), S. Treaty Doc. No. 110-20, 100th Cong. 2d Sess. 7 (1988) (reprinting Convention), Art. 1-3 ("1985 Torture Convention");

    2) those made equally binding upon the CNMI, including the <u>1951 Convention</u>, the <u>1967 Protocol</u>, and the <u>1985 Torture Convention</u>, by effect of Article I, §102 of the <u>Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America</u> ("Covenant"), and as noted in <u>CNMI v. Inabangan</u>, Cr.No. 98-0248, <u>Order Denying Motion....</u> at pp. 3-4 (CNMI Super.Ct. Aug.3, 1999);

    3) international laws to which the Federal and CNMI governments are obligated by effect of <u>jus cogens</u> and similar doctrines; and,

    4) various CNMI and Federal constitutional provisions (e.g., due process/equal rights) having legal effect; and,

    b. various court rulings, pleadings, and related materials, copies of which are appended to this declaration, including:

    1) <u>Tran v. Com. of the Northern Mariana Islands</u>, 780 F.Supp. 709, 714 (1991), <u>aff'd</u>, 993 F.2d 884 (9th Cir. 1993)(recognizing the CNMI's lack of any "policy on refugee status or political asylum"), Exhibit "4";

2)  _S. v. Shi, et.al._, Crim  No. 99-0050, _United_
_States' Opposition  ...  Dismissal...._, at 3,  lines 10-13, 15-16,
(D.N.Mar.Isl. Aug. 3, 1999), **Exhibit "5"**;

3)  In Re: Indefinite Detention Cases, CV 98-674
TJH (JWJx) and cases listed in Appendix, Memorandum Opinion
(C.D.Cal. Jan. 27, 2000 (opinion in which Hon. Terry J. Hatter,
Chief United States District Judge for the Central District of
California, explained to the many Federal Magistrates under his
supervision, that indefinite detention of immigration detainees,
and suspension of substantive due process rights, is forbidden by
effect of Ninth Circuit precedent (citing Barrera-Echavarria v.
Rison, 44 F.3d 1441, 1448 (9th Cir.), cert. denied, 516 U.S. 976,
116 S.Ct. 479, 133 L.Ed. 2d 407 (1995) and Leng May Ma v. Barber,
357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958) in
which it was noted that: "The Supreme Court has consistently
recognized that 'our immigration laws have long made a distinction
between those aliens who have come to our shores seeking
admission...and those who are within...after an entry, irrespective
of its legality.  In the latter instance, the Court has recognized
additional rights and privileges not extended to those in the
former category who are merely "on the threshold of initial
entry."'"), **Exhibit "6"**;

4)  Uthayachandran R. Kandiah, et.al. v. U.S.,
et.al., Civil Action No. 00-0005, Complaint For Injunctive,
Declaratory, And Further Relief, (D.N.Mar.Isl. Feb. 10, 2000),
**Exhibit "7"**.

5)  materials relating to, and explaining in part,
the 1985 Torture Convention (precluding refoulement (return) to
country of origin of any in danger of being subjected to severe
pain or suffering, whether physical or mental, inflicted on a
person for such purposes as punishing him for an act he or a third
person has committed or is suspected of having committed, or for
any reason based on discrimination of any kind), **Exhibit "8"**.

14.  Based on the facts and considerations described above, I
have authorized Mr. Jorgensen:

a.  to continue with efforts, currently underway, to
require the acceptance, processing, and meaningful/impartial
disposition, of:

1)  my application for Federal/CNMI asylum
protection; and,

2)  my simultaneous request for consideration under
the 1985 Torture Convention, see **Exhibit "8"**, at §34.07;

b.  to include me, as an additional Plaintiff, in
Uthayachandran R. Kandiah, et.al. v. U.S., et.al., Civil Action No.
00-0005 (D.N.Mar.Isl.) and, by so doing, to:

1)    sure that I am not sub. 'ted, by either the Federal or CNMI Governments, to unlawful refoulement to Bangladesh; and,

2) initiate additional claims pursuant to 42 U.S.C. §1983 (and other theories of recovery) against various persons including those who, during the past 20 months, have acted under color of CNMI and/or Federal law; and,

c.    to seek by application under oath signed by Mr. Jorgensen on my behalf, and as permitted by 6 CMC §7102, issuance from the CNMI Superior Court of a writ of habeas corpus releasing me immediately from the indefinite and unlawful imprisonment to which I have been subjected during the past twenty (20) months.

Dated:    Saipan, MP, February 23, 2000.

_____
Juyel Ahmed

## SUPPLEMENTAL DECLARATION OF JUYEL AHMED

I, Juyel Ahmed, declare and verify, under penalty of perjury

of the Commonwealth of the Northern Mariana Islands ("CNMI"), that:

1.      I am a Bangladesh citizen presently being imprisoned, by
the CNMI Government, at the prison facility operated by the CNMI's
Department of Labor and Immigration ("DOLI").

2.      I have been imprisoned by the CNMI, for an indefinite
period, since July 1, 1998 (more than 20 months).

3.      During a significant period of my imprisonment, a second
Bangladesh citizen, named Rofigul Islam, was also imprisoned at the
DOLI prison.

4.      Mr. Islam and I are members of the Muslim religion and,
throughout our imprisonment at the DOLI prison, have attempted to
practice our Muslim faith.

5.      During our imprisonment at DOLI, Mr. Islam and I were
subjected to treatment different from other prisoners which
treatment was initiated at the direction of CNMI Assistant Attorney
General Robert Goldberg.  For example:

a.      Following the U.S. Senate oversight hearings
relating to CNMI immigration policies, and Mr. Goldberg's return to
Saipan from Washington, D.C., Mr. Goldberg came to the DOLI prison.
There, Mr. Goldberg:

1)      Took Mr Islam and me aside, notified us that he
had visited the Bangladesh Embassy during his trip to Washington,
D.C., represented that the Bangladesh Embassy had refused to comply
with various demands/"requests" Mr. Goldberg had made at the
Bangladesh Embassy for issuance of passports, and attempted to
coerce Mr. Islam and me into helping the Bangladesh Government
acquiesce to Mr. Goldberg's demands/"requests";

2)      When Mr. Islam and I refused to comply with Mr.
Goldberg's demands/"requests" at the DOLI prison, Mr. Goldberg
responded by ordering that Mr. Islam and I be subjected to "24-hour
lockdown" for three hundred and sixty five (365) days per year;

3)      As the direct result of Mr. Goldberg's orders,
Mr. Islam and I were immediately subjected to "24-hour lockdown",

1



EXHIBIT "B"

throughout the following 2-week period, during which Mr. Islam and I were:

        a) Physically prevented from leaving our respective cells (called "rooms" by some DOLI guards);

        b) Not permitted to smoke cigarettes or to have access to smoking materials;

        c) Not permitted to play cards or have access to playing cards;

        d) Not permitted to read newspapers or have access to entertainment of any type; and,

        e) Not permitted to communicate with any persons (either in person or by telephone or by letter) other than the DOLI guards who periodically entered our DOLI cells; and,

    b.    Having continued to be forbidden from communicating (either in person or by telephone) with any persons outside the DOLI prison, I learned during December 1999, that:

        1) There had been delivered to DOLI guards, a week earlier, two (2) letters for me (one letter was from my mother in Bangladesh, and the second from my friend);

        2) Both letters had been opened, and photocopied by DOLI personnel, before being delivered to me;

        3) DOLI personnel retained possession of photocopies of both letters, in DOLI files, for Mr. Goldberg's use; and,

        4) Delivery of the letters, to me, had been delayed: a week had passed between the day the letters were received at the DOLI prison, and the date the letters were finally delivered to me by DOLI personnel.

    6.    The "24-hour lockdown", ordered by Mr. Goldberg to continue every day Mr. Islam and I remained in the DOLI prison, lasted for a two-week period, before being relaxed by DOLI guards (except while Mr. Goldberg is present at the DOLI prison).

    7.    Mr. Islam and I, additionally, were forbidden from transmitting letters to persons outside the DOLI prison, and from being able to communicate with any persons, such as family members, friends, or lawyers, who might be able to assist us or to explain to us the meaning and availablity of habeas corpus relief, equal protection under CNMI and Federal law, and other legal and equitable remedies.

8    Of all persons imprisoned at DOLI during the above-described times, Mr. Islam and I, upon information and belief, were the only persons of Bangladesh citizenship, and the only persons known by Mr. Goldberg to be practicing the Muslim religion.

Dated:    Saipan, MP, February 27, 2000.

JUYEL  AHMED
Juyel Ahmed

3

Present address:

**Department 95, PMB 1001, Saipan MP 96950**

| Date of birth: (month/day/year) | Place of birth (city or town) | (Province) | (Country) | Present nationality: |
|---|---|---|---|---|
| 01/30/55 | Beijing | | PRC | PRC |

Country from which I fled or was displaced: **Peoples' Republic of China**     On or about (month/day/year): **August 5, 1992**

Reasons: (State in detail):

**Applicant was inflicted with a gunshot wound caused by PRC security orces while applicant participated in pro-democracy demonstrations in eijing. To avoid subsequent persecution, applicant escaped PRC with assista rom otherPRC citizens. Applicant is also a practicing Christian, with more han one child, and is married to a U.S. Citizen. Applicant's co-demonstrato s believed to have been jailed or killed upon returning to PRC. Applicant ears jail, torture, or death by PRC officials if applicant is deported to P**

My present immigration status is     **Saipan, CNMI**     is     **Immigration Detention**
(country in which residing)

Evidence of my immigration status is:

**ot available: PRC officials refuse to issue passport hoping, instead for pplicant to be deported to PRC.**

| . Name of spouse: | 6. Present address of spouse (if different) | 8. Nationality of spouse: |
|---|---|---|
| Herring, Liang Mui | Same | United States |

a. My spouse ☒ will ☐ will not  accompany me to the United States.

| 1. Name of child (ren) | Date of birth | Place of birth | Present address (if different) |
|---|---|---|---|
| Si Chen Liang | 10/1/85 | Beijing | Beijing |
| | | | |
| | | | |
| | | | |

Place a mark (x) in front of name of each child who will accompany you to the United States.

2. Schooling or education

| name and location of school | Type | Dates attended | Title of degree or diploma |
|---|---|---|---|
| Middle School | | through 6th grade | |
| High School | | 1971 | High School Graduate |
| | | | |

3. Military service     N/A

| Country | Branch and organization | Dates | Serial No. | Enlisted and |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Form I-590 (Rev. 11-13-82)T



EXHIBIT "C"

ged Message Chinese (Cr   Brian) Mission c/o
.O. Box 20099 GMF, Guam   Tel. (671) 477-8959

rean Presbyterian Church, Chinatown, Saipan MP

☐ have ☒ have not been charged with a violation of law. (If you have ever been charged with a violation of law, give date, place and nature of each charge and the final result.)

☒ have ☐ have not been in the United States. (If you have ever been in the United States, show the dates of entry and departure and the purpose of your entry (visitor, permanent resident, student, seaman, etc.)
have been to Guam. There, I married my wife. My Social Security Number
s 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.

File or Alien Registration Number:

I have the following close relatives in the United States:

| Name | Relationship | Present address |
|---|---|---|
| erring, Liang Mui | Wife | Same as above |

I am being sponsored by (Name and address of United States sponsor):

lang Mui Herring (my wife). Attached are my marriage documents.

Date 8/30/99    Signature of registrant   Roi Liang

## DO NOT WRITE BELOW THIS LINE

_____, do swear (affirm) that I know the contents of this registration subscribed by me including the attached documents, that the same re true to the best of my knowledge, and that corrections numbered ( ) to ( ) were made by me or at my request, and that this registration was signed y me with my full, true name:

_____
(Complete and true signature of registrant)

ubscribed and sworn to before me by the above-named registrant at _____ on _____
(month/day/year)

_____
(Signature and title of officer)

| INTERVIEW | APPROVED |
|---|---|
| DATE | DATE |
| Immigration Officer | Officer in Charge |

## INSTRUCTIONS

is form should be executed, signed and submitted to the Officer in Charge of the nearest overseas office of the United States Immigration and aturalization Service. When your name has been reached as a registrant you will be furnished additional instructions.

gistration - A separate Registration Form must be executed by each registrant and submitted in one copy. A Registration Form in behalf of a child der 14 years of age shall be executed by the parent or guardian.

blic reporting burden for this collection of information is estimated to average 35 minutes per response. If you have comments regarding the ccuracy of this estimate or suggestions for simplifying this form, you can write to both the U.S. Department of Justice, Immigration and Naturalization rvice Policy Directives and Instructions Branch (HQPDI), Washington, D.C. 20536 and to the Office of Management and Budget, Paperwork duction Project: OMB No. 1115-0057, Washington, D.C. 20503.

Bruce Lee Jorgensen
Attorney At Law*
MSV II Building, 2d Floor
Garapan Village
Saipan, MP 96950
(670) 233-5261 (tel)
(670) 233-5260 (fax)

*Admitted in all Hawaii State And Federal Courts; Ninth Circuit Court of Appeals; District Court of
the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands

August 9, 1999 (CNMI)/August 8, 1999 (U.S. Mainland)

Original via hand-delivery; copy via fax (670) 234-9159/233-7833

Oscar Martinez
U.S. Department of Justice
Immigration and Naturalization Office
Horiguchi Building, Third Floor
Garapan Village
Saipan, MP  96950

Re:  U.S. Refugee Applicants/INS Form I-590 Processing

Dear Mr. Martinez:

During the past several weeks, several hundred Peoples' Republic of China ("PRC") citizens now residing in the Commonwealth of the Northern Mariana Islands ("CNMI"), have communicated to me their intent to seek refugee status under United States ("U.S.") laws and United Nations ("U.N.") human rights obligations made applicable within the U.S. and the CNMI.

Many of those CNMI-situated PRC citizens have now been provided INS Form I-590 refugee applications.  They include a Christian priest, a former Beijing news reporter, many women with multiple children, and various political dissidents including Li Falun Gong movement and China Democracy Party members.  For some, the I-590 applications will be completed this week.

Given the above-described circumstances, I am writing to request that you notify me whether I-590 applications submitted on behalf of PRC applicants will be accepted by your office, should be transmitted to another INS office for processing, or will be wholly rejected by INS officials.

In the event that the applicants are not accepted for processing by INS officials, copies will also be forwarded to U.N. officials for processing.  Communications by and between P. Roy Catalani (a Hawaii-based immigration law specialist), U.N. attorneys, and me, are expected to continue this week.  Please let me know whether you or other INS officials might be interested in participating in those discussions.



EXHIBIT "D"

August 9, 1999 (CN )
Page Two

The U.N. refugee application processing time has reportedly been quite lengthy in past years. One consequence of that delay has been the perception that CNMI-based U.N. applicants could not be deported from the CNMI or travel to the U.S. while applications were pending, but were required to remain for years in the CNMI.

I would also appreciate any information you, INS officials, and others, are willing to provide with respect to the so-called "Tinian boat people". FOIA requests for production of that information are also in the process of being prepared.

One source represented to me that only 290 of the approximately 500 "boat people" were repatriated to the PRC from Tinian, and that the remainder were processed for refugee status by Federal officials, and then transported to the Mainland U.S.

Another source represented that CNMI Immigration/DPS personnel assigned to guard the "boat people" quarantine area were instructed by senior CNMI Immigration officials, to prevent anyone, and "especially lawyers", from entering the Tinian detention areas and conferring with the "boat people".

A third source claimed to have been advised, while providing services within a Tinian detention area, that Federal and CNMI officials there made clear their intent to keep quiet both the fact that many of the "boat people" detainees were being processed for refugee consideration with transit to the U.S., and the prospect that such an option might be available to all of the 12,000 or so PRC citizens now residing in the CNMI (even those here illegally).

Equally confusing is the position taken with respect to this situation by the Saipan Garment Manufacturers' Association ("SGMA") and/or recently attributed to SGMA Spokesperson Richard A. Pierce. During an August 7, 1999 youth basketball game, CNMI attorney James E. Hollman was approached by Pierce who, Hollman later explained: (i) scathingly criticized the efforts being made by Catalani, me, and others, to assist prospective PRC refugees; and, (ii) expressed the view that my efforts amounted to "a deathwish".

When I later telephoned Pierce to confirm the "deathwish" view, he would not confirm or deny having expressed that view, and said "Don't bother me". When personally asked about the "deathwish" view during a chance encounter today, Pierce glared at me, refused to respond, and stalked out of the restaurant.

I remain uncertain whether Pierce's "deathwish" view constitutes his personal opinion, an SGMA position, or an implicit threat against me. If a threat, perhaps your office might be inclined to have Federal Bureau of Investigation officials consult

ith Pierce.  Or, if the "deathwish" view is an o icial SGMA osition being relayed by Pierce, perhaps some question should be aised concerning SGMA's commitment to ensuring that its PRC mployees are afforded full and equal human rights protection in he CNMI.

Pierce's view, in any event, certainly seems a departure from is previously-portrayed "businesses for social responsibility" ttitude.

As for seeking assistance or protection from within the CNMI, t occurs to many that the present CNMI Immigration leadership pparently acts at the whim of SGMA officials:  imposing the July 7, 1999 ban on all PRC immigration to the CNMI; lifting the ban, ine days later, to permit CNMI entry for only those PRC citizens ired by Pierce's SGMA affiliates; and, in the process, claiming to ave a firm grasp of a problem repeated 12,000 times by CNMI mmigration leadership, i.e., the entry of 12,000 prospective PRC efugee applicants into the CNMI during the past few years.

PRC citizens working in the CNMI are, after all, entitled to he same human rights as the rest of us.  And, interestingly, it as been the local community which has recognized and supported hose rights, and our efforts to protect those rights:  as opposed, hat is, to the PRC employers, SGMA affiliates, and (reportedly) he current CNMI Immigration leadership, apparently incensed at the ublic mention or the prospect of those rights being exercised by RC citizens in the CNMI.

Please contact me at your convenience if you have any uestions or comments pertaining to any of the matters addressed in his letter, or any related matter.

Respectfully yours,

Bruce L. Jorgensen

Roy Catalani, Esq.
mes E. Hollman, Esq.
drew Painter, Esq., UNHCR
chard A. Pierce
gina Germain, Esq., Senior Legal Counsel, UNHCR
n Whitney, Esq., INS General Counsel's Office



# Bruce Lee Jorgensen

Attorney At Law*

MSV II Building, 2d Floor

Garapan  Village

Saipan, MP  96950

(670) 233-6901/6902 (tel)

(670) 233-6903 (fax)

*Admitted  in all Hawaii State And Federal Courts; Ninth  Circuit Court of Appeals; District Court of
the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands

February 8, 2000 (CNMI)/February 7, 1999 (Hawaii)

Mr. Oscar Martinez
U.S. Department of Justice
Immigration and Naturalization Office
Horiguchi Building, Third Floor
Garapan Village
Saipan, MP  96950
via hand-delivery and
via certified mail/return receipt

Donald Radcliffe, District Director
Mary Osaka, Esq., District Counsel
U.S. Department of Justice
Immigration and Naturalization Office
595 Ala Moana Boulevard
Honolulu, HI  96813
via certified mail/return receipt

District Director
U.S. Department of Justice
Immigration and Naturalization Service
American Embassy (Bangkok)  -
Box 12
APO AP 96546-0001
via international mail/return receipt

Officer-in-Charge
U.S. Department of Justice
Immigration and Naturalization Service
American Embassy (Manila)
APO AP 96440
via international mail/return receipt



EXHIBIT **E**

Mr. Oscar Martinez, et.al.
February 8, 2000 (CNMI)
Page Two

Re:  INS Form I-590

Applicants' Names:

1.   Uthayachandran Rasamuthu Kandiah
2.   Jayakumar Arunthavam Sevaratnam
3.   Kanagasabai Selvalingam
4.   Janaka Prasanna Hewa Nadungodage
5.   Madpathage Don Urendra Dhammika Senanayake
6.   Yu Ren Huang
7.   Li Tong Deng
8.   Zhi Ping Hu
9.   Yin Ping Guo
10.  Xi Cheng Jin
11.  Lan Ting Zhang
12.  Qin Yin
13.  Chun Fang Yue
14.  Hui Ping Zhang
15.  Mhing Zhuo Ling
16.  Lin Zheng
17.  Jian Shan Zheng

Applicants' Locale:  Commonwealth of the Northern
Mariana Islands

Dear All:

Enclosed, for processing by United States Immigration and
Naturalization Service ("INS") officials, are seventeen (17) INS
Form I-590 applications.

The forms are being submitted on behalf of my clients,
described above, who presently reside within the Commonwealth of
the Northern Mariana Islands ("CNMI"). Messrs. Kandiah,
Sevaratnam, and Selvalingam are Sri Lankan citizens of Tamil
ethnicity. Messrs. Nadungodage and Senanayake are Sri Lankan
citizens of Sinhalese ethnicity. The remainder are citizens of the
Peoples' Republic of China.

To ensure that the I-590 application forms are not lost, the
original forms will be hand-delivered to Mr. Martinez' office,
while the forms transmitted by mail will be copies.

During an August 10, 1999 (CNMI time) telephone conversation,
Mr. Martinez notified me that neither the Saipan-situated INS
office, nor any other INS office, would accept for submission and
processing any I-590 forms completed by any CNMI-situated persons.
As a result of that purportedly unlawful conduct, there was filed
in the U.S. District Court for the Northern Mariana Islands, a

Mr. Oscar Martinez, et.al.
February 8, 2000 (CNMI)
Page Three

civil lawsuit titled <u>Rui Liang and Liao Da Nian v. United States of America, Commonwealth of the Northern Mariana Islands, and Does 1-25</u>, Civil Action No. 99-0046.

Since then, Mr. Martinez has steadfastly refused to accept transmittal of documents hand-delivered to his Saipan office. That refusal, highlighted in the January 19, 2000 letter designated Exhibit "i" (enclosed), culminated with his decision to place on the ground outside his office an envelope and document hand-delivered to him, moments earlier, on my behalf.

Consequently, there shall be filed tomorrow, in the U.S. District Court for the Northern Mariana Islands, a second civil lawsuit, naming the United States and CNMI governments as defendants.

As a result of the first lawsuit, Messrs. Liang and Nian were recently freed from imprisonment, with their claims for damages and other relief pending. Robert Stamerra, a Washington D.C.-based INS employee, travelled 8,000 miles to interview them on Saipan. And the CNMI and Federal governments, all the while, have strived to keep intact the veil of secrecy with which they have shrouded the entire asylum issue (refusing to produce even a single document relating to prior or prospective CNMI/Federal written or verbal asylum arrangement(s)).

So much for concepts like "Open Government", "Public Servants", and "Government For The People".

In any event, the second lawsuit shall, similarly, seek legal and equitable relief, including but not limited to an injunction compelling INS officials to accept and process the I-590 forms being submitted with this letter, restraining the CNMI and Federal governments from arresting, imprisoning, and/or deporting my clients, and an award of monetary damages, attorneys' fees, and costs.

Please contact me at your earliest convenience if you have any questions or comments pertaining to any of the matters addressed in this letter, or any related matter. Thank you for your anticipated assistance.

Sincerely,

Bruce L. Jorgensen

Bruce L. Jorgensen

Encl. -seventeen (17) completed I-590 forms
      -copy of letter designated Exhibit "i"





# Bruce Lee Jorgensen
Attorney At Law*
Lizama Building, 2d Floor
P.O. Box 5682 CHRB
Saipan, MP 96950
(670) 233-3500 (tel)
(670) 233-3501 (fax)

*Admitted in all Hawaii State And Federal Courts; Ninth Circuit Court of Appeals; District Court of
the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands

February 24, 2000 (CNMI)/February 23, 1999 (Hawaii)

Mr. Oscar Martinez
U.S. Department of Justice
Immigration and Naturalization Office
Horiguchi Building, Third Floor
Garapan Village
Saipan, MP 96950
via hand-delivery and
via certified mail/return receipt

Donald Radcliffe, District Director
Mary Osaka, Esq., District Counsel
U.S. Department of Justice
Immigration and Naturalization Office
595 Ala Moana Boulevard
Honolulu, HI 96813
via certified mail/return receipt

District Director
U.S. Department of Justice
Immigration and Naturalization Service
American Embassy (Bangkok)
Box 12
APO AP 96546-0001
via international mail/return receipt

Officer-in-Charge
U.S. Department of Justice
Immigration and Naturalization Service
American Embassy (Manila)
APO AP 96440
via international mail/return receipt

Herbert D. Soll, Esq.
Acting Attorney General
Commonwealth of the Northern Mariana Islands
Capitol Hill
Saipan, MP 96950
via facsimile: (670) 664-2349

EXHIBIT __F__

Mr. Oscar Martinez    t.al.
February 24, 2000 (CNMI)
Page Two

      Re:  <u>Rui Liang, et.al. v. U.S., et.al.</u>, Civil Action No.
           99-0046, U.S. District Court for the Northern Mariana
           Islands

           <u>Uthayachandran Kandiah, et.al. v. U.S., et.al.</u>, Civil
           Action No. 00-0005, U.S. District Court for the Northern
           Mariana Islands

           INS Form I-590 Applicants:

1. Rui Liang
2. Liao Da Nian
3. Uthayachandran Rasamuthu Kandiah
4. Jayakumar Arunthavam Sevaratnam
5. Kanagasabai Selvalingam
6. Janaka Prasanna Hewa Nadungodage
7. Madpathage Don Urendra Dhammika Senanayake
8. Juyel Ahmed
9. Yu Ren Huang
10. Li Tong Deng
11. Zhi Ping Hu
12. Yin Ping Guo
13. Xi Cheng Jin
14. Lan Ting Zhang
15. Qin Yin
16. Chun Fang Yue
17. Hui Ping Zhang
18. Mhing Zhuo Ling
19. Lin Zheng
20. Jian Shan Zheng

        Applicants' Locale:  Commonwealth of the Northern
                            Mariana Islands

Dear All:

    Enclosed, for processing by United States Immigration and
Naturalization Service ("INS") officials, is an INS Form I-590
application being submitted on behalf of Mr. Juyel Ahmed.

    This brings to twenty (20) the total number of Form I-590
applicants now being represented in civil action nos. 99-0046 and
00-0005.

    By transmittal of this letter, please be advised that each of
the applicants also requests, from the Federal and CNMI
governments, protection from <u>refoulement</u> and from danger (in their

Mr. Oscar Martinez, et al.
February 24, 2000 (CNMI)
Page Three

respective home countries) of being subjected to severe pain or
suffering (physical/mental) being inflicted on them, respectively,
for such purposes as punishment for various acts they or third
persons have committed, or are suspected of having committed, or
for reasons based on discrimination of any kind.  This request is
made pusuant to the United Nations Convention Against Torture and
Other Cruel, Inhuman, or Degrading Treatment or Punishment,
G.A.O.R. A/39/506 (1984), 23 I.L.M. 1027 (1984) (modified in 24
I.L.M. 535 (1985)), S. Treaty Doc. No. 110-20, 100th Cong. 2d Sess.
7 (1988) (reprinting Convention), Art. 1-3.

Please contact me at your earliest convenience if you have any
questions or comments pertaining to any of the matters addressed in
this letter, or any related matter.  Thank you for your anticipated
assistance.

Sincerely,

Bruce L. Jorgensen

Bruce L. Jorgensen

Encl.      Completed Form I-590 application (Juyel Ahmed)



COPY

# Bruce Lee Jorgensen

Attorney At Law*

MSV II Building, 2d Floor

Garapan Village

Saipan, MP 96950

(670) 233-5261 (tel)

(670) 233-5260 (fax)

*Admitted In all Hawaii State And Federal Courts; Ninth Circuit Court of Appeals; District Court of the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands

August 10, 1999 (CNMI)/August 9, 1999 (U.S. Mainland)

Original via hand-delivery; copy via fax (670) 234-9159/233-7833

Oscar Martinez
U.S. Department of Justice
Immigration and Naturalization Office
Horiguchi Building, Third Floor
Garapan Village
Saipan, MP  96950

Re:  U.S. Refugee Applicants/INS Form I-590 Processing

Dear Mr. Martinez:

Thank you for advising me, during our telephone conversation this morning, that:

(i) your office will not accept any INS-distributed I-590 forms completed, for submission and processing, by any of the 12,000 or so CNMI-situated Peoples' Republic of China ("PRC") citizens;

(ii) no other INS office will accept any INS-distributed I-590 forms completed, for submission and processing, by any of the 12,000 or so CNMI-situated PRC citizens;

(iii) you will not disclose to me whether the PRC citizens recently detained on Tinian were interviewed by Federal officials relating to the PRC citizens' requests/applications for refugee/asylum status; and,

(iv) you will not disclose to me any information relating to any details involving the PRC citizens recently detained on Tinian, the Federal Government's involvement with those citizens' requests/applications for refugee/asylum status, or any other matter such as the number of those PRC citizens transported to the U.S. Mainland.



EXHIBIT "G"

Oscar Martinez
August 10, 1999 (Cn___)
Page Two


    The information requested in sub-paragraphs (iii)-(iv) shall be requested by me via FOIA submission to the INS. Please advise me where within the INS, and to whom, the FOIA request must be submitted.

    Thank you again for taking the time to briefly converse with me this morning.

                      Respectfully yours,

                      Bruce L. Jorgensen


P. Roy Catalani, Esq.
Andrew Painter, Esq., UNHCR
Regina Germain, Esq., Senior Legal Counsel, UNHCR
Ron Whitney, Esq., INS General Counsel's Office
David Wood, Esq., U.S. Attorney, Saipan



**Bruce Lee Jorgensen**

Attorney At Law*

MSV II Building, 2d Floor

Garapan Village

Saipan, MP 96950

(670) 233-6901/6902 (tel)

(670) 233-6903 (fax)

*Admitted in all Hawaii State And Federal Courts; Ninth Circuit Court of Appeals; District Court of
the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands

**January 19, 2000 (CNMI)**

Robert Goldberg, Esq.          Gregory Baka, Esq.
CNMI Office of the Attorney General   Asst. U.S. Attorney
Civil Division                 Horiguchi Bldg., 3d Floor
Second Floor, Administration Building   Garapan Village
Capitol Hill                   P.O. Box 50377
Saipan, MP 96950               Saipan, MP 96950
via fax:  664-2349             via fax:  236-2945

        Re.  Liang, et.al. v. U.S., et.al., Civil Action No. 99-0046,
             U.S. District Court for the Northern Mariana Islands

Dear Counsel:

        Enclosed are copies of two subpoenas personally served via
hand-delivery, this afternoon, upon Acting CNMI Attorney General
Maya Kara, and Federal INS representative Oscar Martinez.

        While service was being effected upon Mr. Martinez, he
demanded to know from whom the materials originated.  In response,
he was told that they were being delivered from me.  He then
refused to accept delivery.

        Next, Mr. Martinez demanded to know whether a service fee was
being paid, and the amount of any such fee.  He then continued to
refuse to accept delivery of the envelope and subpoena.

        Moments later, Mr. Martinez telephoned a man named "Greg" who
was later described by Mr. Martinez as "a U.S. Attorney".  After
their conversation, Mr. Martinez indicated that he would not open
the envelope, feigning concern that the envelope might contain "a
bomb".  He then wrote a mailing address onto a yellow "post-it"
sticker, which he affixed to the envelope bearing his subpoena.  He
also represented that he was not willing to accept documents hand-
delivered to his office on my behalf:  rather, he insisted, all
such documents would have to be "formally" transmitted to him
via U.S. mail.

        While placing the envelope and subpoena on a nearby
counter top, Mr. Martinez continued to signify that he would not
"accept" delivery of those items.  He remarked that the service



EXHIBIT "H"

Robert Goldberg, q.
Gregory Baka, Esq.
January 19, 2000
Page Two

being effected upon him amounted to "more" of what he termed my
"playing games".

Finally, Mr. Martinez picked up the envelope and subpoena,
walked to his office door, and placed the envelope and subpoena on
the ground outdoors (near the entrance to his office).

Please be advised that: (i) service of the subpoenas does not,
in any manner, constitute "playing games"; (ii) the fee paid for
effecting service was $10.00 per subpoena; and, (iii) the person
who served the subpoenas is my wife, Nestralda Mechaet Jorgensen
(who has repeatedly been instructed to refrain from answering
questions, and to avoid confrontational situations, while effecting
service of subpoenas).

Sincerely,

Bruce L. Jorgensen

Bruce L. Jorgensen

*[handwritten notes in left margin: "7/11/99 to both) orig & copy Viand -del to AG's office 8/12"]*

Attorney At Law
MSV II Building, 2d Floor
Garapan Village
Saipan, MP 96950
(670) 233-5261 (tel)
(670) 233-5260 (fax)

*[handwritten: Date: 3:45 p? rec'd by:]*

*Admitted in all Hawaii State And Federal Courts; Ninth Circuit Court of Appeals; District Court of the N. Mariana Islands; Republic Of Palau; High Court of the Trust Territory of the Pacific Islands*

August 12, 1999 (CNMI)/August 11, 1999 (U.S. Mainland)

**Copy via facsimile; original via hand-delivery**

Maya Kara, Esq.
Acting Attorney General
Office of the Attorney General
Saipan, MP 96950

Mark Zachares, Esq.
Secretary
Dept. of Labor & Immigration
Saipan, MP 96950

Re:  <u>Open Government Act Request, 1 CMC Div. 9</u>

Dear Ms. Kara and Mr. Zachares:

Based on recent communications with United Nations personnel, it is my understanding that the United States ("US") considers the Commonwealth of the Northern Mariana Islands ("CNMI") to be bound by the US accession to the 1967 Protocol to the 1951 Convention Relating to the Status of Refugees ("1951 Convention"). The US Government, therefore, bears the responsibility for ensuring that refugees seeking refugee/asylum status within the CNMI not be subject to <u>refoulement</u> to their countries of origin in violation of Article 33 of the 1951 Convention.

The US, through its CNMI-based INS employee Oscar Martinez, has recently taken the position that neither the CNMI-situated INS-office, nor any other office, will accept for processing any INS-published I-590 forms completed by CNMI-situated Peoples' Republic of China ("PRC") citizens.

Given the situation described in the preceding paragraph, I am writing to request that the CNMI Office of the Attorney General ("OAG") and the CNMI Department of Labor and Immigration ("DOLI") make available to me for inspection within ten (10) days, and pursuant to 1 CMC §9917, the following public records:

(1) OAG's current policy, rules, and procedures for accepting and processing refugee applications, and the date(s) on which they were enacted;

(2) OAG's current policy, rules, and procedures for accepting and processing asylum applications, and the date(s) on which they were enacted;



EXHIBIT

Maya Kara, Esq.
Mark Zachares, Esq.
August 12, 1999 (CN )
Page Two

(3) DOLI's current policy, rules, and procedures for accepting and processing refugee applications, and the date(s) on which they were enacted;

(4) DOLI's current policy, rules, and procedures for accepting and processing asylum applications, and the date(s) on which they were enacted;

(5) any current CNMI policy, rules, and procedures for accepting and processing refugee applications, not described in the preceding sub-paragraphs, and the date(s) on which they were enacted;

(6) any current CNMI policy, rules, and procedures for accepting and processing asylum applications, not described in the preceding sub-paragraphs, and the date(s) on which they were enacted;

(7) any current CNMI, DOLI, and OAG policy and procedures, for accepting and processing refugee applications, which have been modified within the past six (6) months, and the date(s) of modification;

(8) any current CNMI, DOLI, and OAG policy and procedures, for accepting and processing asylum applications, which have been modified within the past six (6) months, and the date(s) of modification;

(9) the name, address, and contact telephone number of each person employed by the US who participated within the past six (6) months in accepting and processing refugee applications on Tinian;

(10) the name, address, and contact telephone number of each person employed by the US who participated within the past six (6) months in accepting and processing refugee applications on Tinian;

(11) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the accepting and processing of refugee applications on Tinian;

Mark Zachares, Esq.
August 12, 1999 (CNM
Page Three

(12) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the accepting and processing of asylum applications on Tinian;

(13) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the accepting and processing of refugee applications prepared within the CNMI;

(14) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the accepting and processing of asylum applications prepared within the CNMI;

(15) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the refugee application hearings within the CNMI;

(16) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between DOLI, OAG, INS, US Department of Justice, and/or US Department of State officials, generated within the past three (3) months, which pertain to the asylum application hearings within the CNMI;

(17) all written memoranda, facsimile transmissions, correspondence, and e-mail transmissions generated by and between OAG, DOLI, and/or DPS relating to limiting persons not detained in the Tinian refugee detention center from meeting, communicating with, and/or conversing with, PRC citizens detained within the Tinian refugee center.

Maya Kara, Esq.
Mark Zachares, Esq
August 12, 1999 (Ch   )
Page Four

In the event that OAG or DOLI intends to deny my requests to inspect any of the public records to which access has been requested in this letter, please specify and explain the grounds upon which the denial is premised, as required by 1 CMC §9918(d).

Thank you for your anticipated assistance.

Sincerely,

Bruce L. Jorgensen

cc:   P. Roy Catalani, Esq.,
      Catalani & Nakanishi
      1212 Davies Pacific Center
      841 Bishop Street
      Honolulu, HI  96813
      Fax:  (808) 536-3532

      Mr. Oscar Martinez
      U.S. Department of Justice
      Immigration and Naturalization Service
      Horiguchi Building, 3d Floor
      Saipan, MP  96950
      Fax:  (670) 234-7833

      Andrew Painter, Esq.
      United Nations High Commissioner
            For Refugees
      Regional Office for the United States
            of America & the Caribbean
      1775 K Street NW
      Suite 300
      Washington, D.C.  20006
      Fax:  (202) 296-5660



~~OFFICE OF THE ATTORNEY~~
1 Floor-Administration Building Capitol Hill'
Caller Box 10007, Saipan, MP 96950



Attorney General/Civil Division
Tel: (670) 664-2341
Fax:(670) 664-2349

August 20, 1999

Criminal Division
Tel: (670) 664-2366/2367/2368
Fax: (670)234-7016

**BY FAX**

Bruce L. Jorgensen, Esq.
Second Floor, MSV II Building
Garapan, Saipan, MP 96950

Re:    Open Government Act Request

Dear Mr. Jorgensen:

I write in response to your August 12, 1999 Open Government Act ("OGA") request, listing 17 numbered paragraphs relating to various immigration-related information ("Request").

We note that the Request is very unclear. Accordingly, we will attempt to respond to the Request as written, to the extent we can discern the meaning of the Request. Furthermore, the Request appears to seek very sensitive and highly confidential intelligence and investigative information. Naturally, such information cannot be produced. Nonetheless, we attempt to respond to the Request as follows:

First, the Request is clearly objectionable on numerous substantive grounds, including, but not limited to, vagueness, ambiguity, burdensomeness and overbreadth.

Second, some or all of the requested information may not fit within the statutory definition of a "public record." See 1 CMC § 9902(f).

Third, to the extent the Request seeks publicly available information, we refer you to Title 3 Division 4 of the Commonwealth Code (as amended by P.L. 11-5, 11-6, 11-33, 11-51, 11-58 and 11-60), related rules and regulations published in the Commonwealth Register, Executive Order 94-3 and immigration case law. Such information is publicly available in the Commonwealth Law Library, the District Court Law Library and the Office of the Attorney General.

Fourth, to the extent the Request seeks information in connection with any pending criminal or civil cases, you should comply with the applicable rules of procedure.



EXHIBIT "J"

4.    No attorney who resides or maintains an office in the Northern Mariana Islands may
be admitted *pro hac vice*

5.    An attorney who is already admitted *pro hac vice* in one case shall not be eligible to
apply for admission in another case until the first case is closed.

No waiver of these conditions will be permitted except for good cause shown.

SO ORDERED this 23 day of August 1999.

MIGUEL S. DEMAPAN, Chief Justice

ALEXANDRO C. CASTRO, Associate Justice

TIMOTHY H. BELLAS, Justice Pro Tem